## MANOR COAL COMPANY *v.* ADAM BALCHUMAS

[No. 23, April Term, 1938.]

454

*Decided May 19th, 1938.*

The cause was argued before BOND, C. J., URNER, OF-
FUTT, PARKE, MITCHELL, SHEHAN, and JOHNSON, JJ.

*Albert A. Doub* and *Elizabeth B. Doub,* for the ap-
pellants.

*Simon F. Reilly,* with whom were *Estel C. Kelley* and
*Charles G. Watson* on the brief, for the appellee.

JOHNSON, J., delivered the opinion of the Court.

Claiming loss of eyesight as a result of an accidental injury sustained by him on February 18th, 1936, in the course of his employment by The Manor Coal Company, Adam Balchumas filed a claim for compensation with the State Industrial Accident Commission, and the latter, after a hearing, found on May 15th, 1937, that his disability was not the result of an accidental injury arising out of and in the course of his employment, by which finding the only issue before it was answered in the negative. From its order disallowing his claim, Balchumas appealed to the Circuit Court for Garrett County, and upon removal to the Circuit Court for Allegany County the cause was heard before a jury upon this issue:

"Is the disability of which the Claimant, Adam Balchumas, now complains the result of an accidental injury arising out of and in the course of his employment by the Manor Coal Company on February 18th, 1936?"

The jury's answer to the issue being "yes", the court thereupon entered judgment reversing the finding of the commission. From that judgment the present appeal is taken.

During the course of the trial appellant reserved three exceptions. The first of these relates to the allowance of a question to Dr. C. S. Gracey, no objection to the same question having been made before the commission; the second to the refusal of the court to strike out the evidence of the same witness, in so far as he expressed an opinion to the effect claimant's disability was or could have been caused by an accidental injury arising out of his employment, while the third relates to rulings upon the prayers.

By claimant's prayer, the jurors were instructed that if they found from the evidence he sustained an accidental, personal injury on February 18th, 1936, arising out of and in the course of his employment by appellant, and such injury caused the disability of claimant for which compensation was then claimed, their answer to the issue should be "yes."

Employer's two prayers numbered "third" and "fourth" were rejected. Each required the jury to answer the issue "no", the third prayer being predicated upon the legal insufficiency of evidence entitling claimant to recover; the fourth challenging the legal sufficiency of evidence to show that his disability arose out of and in the course of his employment by appellant. Since, in reaching a conclusion respecting the correctness of the trial court's action in rejecting these demurrer prayers, we will be required to review all evidence in the case which directly or inferentially supports claimant's right to recover, we will, in our consideration of the third exception, likewise deal with the first and second.

Balchumas, who is forty-eight years of age, had for twenty-seven years been employed as a coal miner, and during the last four and one-half years of that time, he was engaged in mining coal for appellant. On February 18th, 1936, while at work in the mine using a pick, he sustained an injury to his left eye when some foreign substance, dislodged by the pick he was using, became imbedded in its upper lid. He made a statement in connection with his claim for compensation to the effect that, while digging from the bottom of the mine, "dirt flew up in my eyes." A Lithuanian by birth, he knows little English and speaks it with great difficulty and many of the specialists under whose observation he came testified that it was very hard to understand what he attempted to tell them. We quote from his testimony as follows:

"Q. Now speak slowly please, and just tell the commission what happened that day? A. I work in the mine digging, squaring it up for the machine, digging bottom off with a pick and I get dirt in the eye. Q. Now speak slowly. You were digging with this pick, digging the bottom and leveling the bottom? A. Yes, digging the bottom and dirt fly off pick and hit me in the eye. Q. Which eye? A. Left eye (indicating). Q. Did it cause any pain at that time? A. Hurt and pain, swell up, red, eye was red for long time, then it starts I no see, lots of spots in the eye. Q. When you were hurt that day, what

did you do? A. I got in the room and wash up and I went to Dr. Calandrella. Q. What day was that that you went to Dr. Calandrella? A. The same day. Q. When you were hurt that day, what time of the day were you hurt? A. Around dinner time, I don't know exactly. I didn't have a watch. Q. Did you finish the day? A. No, sir—finish day, it was last for the day and we were digging bottom and we square up for machine and have no more coal as we were digging up the bottom for to take out, and dirt hit in the eyes. Q. And did you report this to anyone? A. I report to my foreman. Q. When? A. That same time, I walk in the heading and find foreman coming along and I said I got sore eyes and can't see, and the roadsman takes the dirt out, as much as he can, and then I was going home and go to a doctor. Q. What was the foreman's name that you reported this accident to? A. Fitzhugh Burnell. Q. Who was the roadsman who took the dirt out? A. Floyd Alpritz. Q. You had worked for this coal company for a period of four years, had you worked regularly? A. Before I was hurt? Q. Yes. A. Yes, work every day the mine work. Q. Had you been troubled with your eyes before this? A. No, I have a little dirt in the eye for I guess a week, and then it was all right, then it was good again for a long time. Q. And you could see well before this injury? A. Yes, see good everything. Q. Could you read a newspaper, that is a newspaper of your own language? A. Before, I read my language, but I cannot now. Q. A short time or even a year or so prior to this accident, you took out an insurance policy, didn't you,—were you not examined for insurance? A. Yes, two times. Q. When were your eyes examined? A. I forget that, last examination I guess maybe one year before I get hurt. Q. Were your eyes all right at that time? A. Yes, Dr. Calandrella, the same doctor, examined them, he knows."

He further stated that no one would give him work, because he could not see how to work; that he could not read a newspaper and could just see "a little shine sometimes"; that he could see nothing with his left eye and

could see only lights or yellow streaks with the right eye; further that he could not dig coal because of the condition of his eyes, and that, after being treated by Dr. Calandrella for his injuries, he was sent to a hospital at Keyser, West Virginia. There he was under the care of Dr. Bess, an eye specialist. He was then asked, "Now before February 18th, you were able to get around very well, were you not? A. Yes, I was all right up to the day I was hurt." On cross-examination he admitted having been examined by Dr. Harry Wasserman and by Dr. H. F. Graff, the latter an eye specialist of Baltimore.

The testimony given by Dr. Calandrella before the commission was read to the jury and was to the effect that at the time claimant was injured he was appellant's physician; on the evening of February 18th, 1936, claimant visited him and complained of an injury to his left eye; that he found a foreign body imbedded in its upper left lid which had caused "a little laceration of the eye ball in the medical aspect, that is to say towards the nose"; that the eye was then reddish and putting off water. He removed the foreign body, but found no evidence of any contusion of the eye ball and in four or five days the condition had entirely cleared up, but the claimant shortly after his first visit made complaint about both eyes, yet he could find nothing wrong with the right eye; that the foreign body which he did find had in his opinion no effect upon his vision, but, because of his continued complaints he, suspecting syphilis as a cause, sent him to a free venereal clinic, but could not get positive proof that he had such disease. It may also be stated that Dr. Wasserman of Baltimore, as a result of an extensive examination which included a blood test of the claimant, found nothing to indicate he was a syphilitic sufferer. Dr. Calandrella had no recollection of having made an examination of Balchumas a year previous to the accident, but admitted that he might have made it. He further stated that he did not know whether at that time he had examined claimant's eyes, but he might have done so. Nor did he recall that Balchumas immediately following

the injury complained of his vision, but admitted that he might have made such complaints.

There was next read to the jury the testimony given by Dr. C. S. Gracey before the commission on March 18th, 1937. Although qualifying as an expert upon diseases of the eye, Dr. Gracey had not until the day previous even seen claimant, and from examining his eyes he found nothing wrong with them externally, except that his pupils did not react normally to light. From that examination he estimated claimant's visual loss from an industrial viewpoint to be about ninety per cent. He further stated that in his opinion the condition was permanent, and in response to another question stated he had heard the testimony of claimant and Dr. Calandrella. He was then asked this question: "Doctor, can you form or express an opinion, assuming the truth of all the testimony you have heard, as to what, if any connection, the injury the claimant suffered on February 18th, 1936, has with the disability that he now complains of,—can you form an opinion first?" And the court's action in overruling appellant's objection thereto occasioned the first exception. His answer was as follows: "It is my opinion that the trauma that he received when the foreign body struck his eye is responsible for his present condition."

The argument that no objection to this question can be entertained by the trial court, since none was made to the same question at the hearing before the commission, is not sustainable, and an examination of the authorities cited in support of it will disclose that those decisions were announced after the passage of chapter 406, Acts of 1931, and chapter 508, Acts of 1933, under which on appeal from the orders of the State Industrial Accident Commission neither party could introduce original evidence, and such appeals were heard entirely on the record made before the commission. However, as pointed out by Judge Sloan, speaking for this court, in *Spence v. Bethlehem Steel Company*, 173 Md. 539, 197 A. 302, the repeal and reenactment of that section by chapter 545, Acts of 1935, had the effect of restoring chap-

ter 587 of the Acts of 1927, thus restoring the rule announced in *Standard Gas Equipment Corp. v. Baldwin,* 152 Md. 321, 136 A. 644, holding that objections to questions could be made in the trial court, although not made to the same questions before the commission. See, also *Baltimore v. Perticone,* 171 Md. 268, 188 A. 797. We find no objection to the question as propounded. It was merely preliminary, in the sense of having for its object the purpose of eliciting information as to whether the witness could form an opinion, but not to ascertain what the opinion was. If the appellant has in any way been injured by the answer, this is because it was not responsive to the question, and since no motion was made to strike it out upon that ground, no error is found in the ruling.

From his cross-examination, the following appears:

"Q. Why do you say that, doctor? A. There was evidently some foreign body struck him in the eye, it didn't necessarily have to lacerate to cause that,—he no doubt received a blow, it is my opinion he received a severe enough blow to cause a concussion that affected the optic nerve. Q. You heard the testimony given by the claimant and Dr. Calandrella? A. Yes, sir. Q. Did you hear any evidence there was a trauma, a contusion or blow? A. Yes, sir. Q. Was it read to you that the man had a contusion of the eye? A. It said he had a slight contusion. Q. In whose testimony was that? A. That was the doctor who examined him—as far as the laceration goes that could have occurred afterwards. I don't know the form of the object, but a man using a pick and something flying in the eye, it would certainly have considerable force. Q. Did you hear the testimony, doctor, that the foreign body was imbedded in the upper lid? A. Yes, sir. Q. And that scratched the eye? A. It may have——

"Q. You heard that? A. Yes, sir, I can't be responsible for somebody else's opinion. I give my own. Q. You said there might have been a contusion? A. Yes, sir. Q. Doctor, there is nothing in that indicating there was a contusion? A. I mean laceration. Q. Then you

say there was no contusion? A. There wasn't any there, I didn't see the eye at the time. Q. The first time you saw him was yesterday? A. If the object wasn't sharp edged, he may not have that, that blow could have been struck with something with a smooth surface, and transmitted that blow, causing a concussion. Q. Doctor, that is all supposition, we have no evidence of what did happen? A. I say it could happen, it probably did."

Dr. Gracey's diagnosis was that claimant was suffering with traumatic iritis of the left eye and that the failure of vision in the right eye was due to what he described as a sympathetic condition.

In addition to being examined by Dr. Bess, of Keyser, West Virginia, and by Dr. Sisson at the venereal clinic, and Dr. Wasserman, of Baltimore, claimant was also examined by Dr. Meyers, another eye specialist, in July, following his eye injury. Dr. Meyers' diagnosis was that he was suffering from atrophy of the optic nerve, which he attributed to some constitutional infirmity of claimant. He was also examined by Dr. Sharrett, another eye specialist, who found no indication of any injury to his eyes, and in August, 1936, Dr. H. F. Graff, an eye specialist of Baltimore, after examining him, found no evidence of an injury which in his judgment could explain the condition complained of, and strongly suspected that he was malingering.

Appellant urges that since the seven physicians who examined claimant were of the opinion that his loss of vision had no connection whatsoever with the injuries sustained by him on February 18th, 1936, this is a sufficient ground to have justified the trial court in granting its motion, made at the conclusion of all the evidence, to exclude from the jury's consideration the testimony given by Doctor Gracey to the extent that he expressed an opinion that claimant's disability was or could have been caused by an accidental injury arising out of his employment.

Assuming, without deciding, that the motion as made was not too general to enable the court precisely and

conveniently to identify just what testimony of Dr. Gracey it was intended to reach (*Brewer v. Bowersox,* 92 Md. 567, 48 A. 1060; *Wilson, Close & Co. v. Pritchett,* 99 Md. 583, 58 A. 360; *United Rys. & Electric Co. v. Wehr & Co.,* 103 Md. 323, 63 A. 475; *Balto. & O. R. Co. v. Whitehill,* 104 Md. 295, 64 A. 1033), we are of the opinion it was properly overruled. Apart from a proper question propounded Dr. Gracey, the answer to which, although irresponsive, was not objected to, an examination of the record, containing seven pages of testimony which he gave, discloses no instance in which he was permitted to answer a question over appellant's objection. In this case, no objection to the testimony referred to having been made at the time it was given but made at the close of all the evidence, it cannot be contended that appellant acted seasonably or diligently. This alone is a sufficient reason for its denial. *Rent-A-Car Co. v. Globe & Rutgers Fire Ins. Co.,* 161 Md. 249, 156 A. 847; *North Bros. v. Mallory,* 94 Md. 305, 51 A. 89; *Washington County v. Gaylor,* 140 Md. 375, 379, 117 A. 864. See also *Dashiell v. Jacoby,* 142 Md. 330, 337, 120 A. 751; *Bowles v. Moller, Inc.,* 163 Md. 670, 164 A. 665; *J. Norman Geipe, Inc. v. Collett,* 172 Md. 165, 190 A. 836.

Moreover, when testimony is admitted without objection, although had one been made it would have been excluded as incompetent, it must be treated as properly in the case, and its truth is accepted in considering the demurrer prayers. *Slingluff v. Builders' Supply Co.,* 89 Md. 557, 43 A. 759; *Struth v. Decker,* 100 Md. 368, 59 A. 727; *Laporte Corp. v. Pennsylvania-Dixie Cement Corp.,* 164 Md. 642, 649, 165 A. 195, 168 A. 844; *Kauffman Construction Co. v. Griffith,* 154 Md. 55, 60, 139 A. 548.

This brings us to a consideration of the one prayer offered by claimant and the two demurrer prayers of appellant. In considering the demurrer prayers, we are not concerned with the weight of the evidence, but must deal solely with its legal sufficiency to enable a rational finding that claimant's loss of vision was attributable to his injuries of February 18th, 1936.

In *Moller Motor Car Co. v. Unger,* 166 Md. 198, 170 A. 777, it was shown that an employee, seventy years of age, and in apparently good health, had, while at work, received a severe blow on the head. Within a week or ten days, without any known intervening cause, the workman showed symptoms of paralysis and grew steadily worse, until his death about three months later from a cerebral hemorrhage. This court held that it was a question for the jury as to whether his accident was the proximate cause of the death, although in that case his attending physician was unable to say that the injury caused the hemorrhage, but stated it could have caused it, and he knew of no other cause.

It was said in *Spence v. Bethlehem Steel Co., supra,* "In *Kauffman Construction Co. v. Griffith,* 154 Md. 55, 139 A. 548, the only evidence of injury was from statements made by the employee, which were not objected to, and therefore had all the force of direct evidence."

In *Ross v. Smith,* 169 Md. 86, 179 A. 173, this court was dealing with a proceeding for compensation for an employee's death caused by aggravation and strangulation of a pre-existing hernia. Prior to his death, the employee told the surgeon he had twisted his side four or five days previously, as a result of which pain in his right side had followed. Although there was an apparent difference of several days between the time he received his alleged injury and his estimate of the number of days that had elapsed since he had twisted his side, it was held to be a question for the jury to decide whether the occurrence to which he made reference was or was not what had happened at the time his injury had occurred.

Again in the recent case of *Spence v. Bethlehem Steel Co., supra,* we held that statements of an employee, since deceased, to his wife and physician, were admissible on an issue as to whether his death from lobar pneumonia resulted from an accidental injury, and reversed the judgment of the trial court which had been entered pursuant to a directed verdict for the employer.

In *Neeld Construction Co. v. Mason,* 157 Md. 571, 146

A. 748, claimant, while employed as a carpenter, was injured by a piece of granite, which by reason of a blasting operation struck him in the chest and injured the bones of his forearm. His claim under the Workmen's Compensation Act (Code Pub. Gen. Laws 1924, art. 101, sec. 1 *et seq.*) was sustained by the commission to the extent of an award for total disability for a definite period and permanent partial disability during a further period, but the award did not recognize his claim for a permanent total loss of use of his arm and a temporary total disability caused by injury to his heart from the blow he received. On appeal to the Circuit Court for Cecil County, the order of the commission in disallowing his claim for injury to his heart was reversed. Upon appeal to this court, it was contended that, since all the medical witnesses had found that claimant's heart disease did not result from the accident, the evidence in his behalf was legally insufficient, and the jurors should have been so instructed, but during the course of that opinion Judge Urner, speaking for this court, said (page 749) :

"Apart from the opinions of the medical experts, the evidence was clearly sufficient to require the submission to the jury of the issue as to the injurious effect upon the claimant's heart of the blow inflicted upon his body in the region of that organ. The weight of the stone, the force of the explosion by which it was hurled, the unconsciousness and subsequent suffering caused by the violence of the impact, would naturally suggest the possibility of injury more deep-seated than the contusions of the chest wall and abdomen described in the testimony. It is a very significant fact, according to the evidence, that the claimant had a sound heart and vigorous health to the time of the accident, but is now an invalid because of a heart condition discovered during the period of the hospital treatment of his injuries. The view that the trouble with his heart was not caused by the blow, but probably by some infection, is inconclusive upon the question which we have now to decide. The evidence tends to exclude any other source of infection than that

which developed in the claimant's injured arm. While a systolic murmur of his heart had been noticed before the infection originated, as Dr. Foley testified, yet the arm infection existed before the more serious symptoms of the heart irregularity were manifested. There is a reasonable basis for the inference of a causal relation between the accidental injury received by the complainant in the course of his employment and the ensuing condition of his heart by which his ability to work has been impaired. *Dickson Construction & Repair Co. v. Beasley*, 146 Md. 568, 126 A. 907; *Bramble v. Shields*, 146 Md. 494, 127 A. 44; *Kauffman Construction Co. v. Griffith*, 154 Md. 55, 139 A. 548; *Armour Fertilizer Works v. Thomas*, 153 Md. 631, 139 A. 356. The refusal to withdraw the issue from the jury was correct."

For further illustrations concerning proximate cause and causal connection, see *Schneider on Workmen's Compensation*, sec. 234.

It is undisputed that until the date of his injury claimant's eyesight was such as to permit him to perform his duties as a miner. His testimony is clear that prior to that date his eyesight was good, but from that time his eyes were inflamed, and this condition rapidly progressed until he was practically blind and unable to work. In support of his contention, he makes the statement that within one year prior to the date of his injury Dr. Calandrella examined his eyes and found them to be good, and this is not denied. Dr. Gracey, who examined him, found his visual loss to be ninety per cent. and was of the opinion that the condition was permanent. He also expressed the opinion that the present condition of claimant's eyes was the result of the injury he had received on February 18th, and without arguing the point as to whether his opinion was based upon facts proven in the case, as previously observed, the opinion is properly a part of the evidence for whatever it is worth. Dr. Meyers expressed the belief that claimant's disability was the result of optic nerve atrophy, but there is nothing in the record to show, either directly or inferentially,

that this condition could not have developed as a result of the injuries which admittedly claimant sustained, and while a great majority of the physicians who testified expressed the belief that Balchumas' affliction resulted from constitutional causes, it is significant that, although from February 18th, 1936, until the trial of this case in the Circuit Court for Allegany County on November 5th, 1937, none of them, in spite of the many examinations to which claimant subjected himself, were able to discover any such cause.

We, therefore, entertain no doubt, in view of the evidence and the authorities cited, as to the existence of a reasonable basis for the inference of a causal relation between claimant's accidental injury and his loss of vision. The appellant's demurrer prayers were, therefore, properly rejected, and since we have found no error in the instruction granted at the request of the plaintiff, the judgment appealed from must be affirmed.

*Judgment affirmed, with costs.*